**OHIO STOVE COMPANY, Appellant, v. BOWERS, Tax Commr., Appellee.**

Board of Tax Appeals, Department of Taxation, State of Ohio.

No. 42399.   Decided May 16, 1960.

Bricker, Evatt, Barton, Eckler & Niehoff, by William S. Evatt and William R. Chadeayne, Columbus, for appellant.

Mark McElroy, Atty. Genl., by Joseph L. White, John J. Dilenschneider, Asst. Attys Genl., for appellee.

## OPINION

This cause and matter came on to be considered by the Board, of Tax Appeals upon a notice of appeal filed herein under date of January 26, 1960, by the appellant above named from a final order of the Tax Commissioner dated December 29, 1959, in and by which final order that official confirmed a sales and use tax assessment theretofore made against appellant in the following basic amounts:

Sales Tax _____$ 758.98
Use Tax _____ 2,580.94

Total Basic Assessment _____$3,339.92

The basic assessment, in each instance, is subject to an added penalty in an amount to be contingent upon the date of payment of the basic assessment, all as set out by the terms of the final order.

The audit period involved in both the sales and use tax assessment is January 1, 1955, through December 31, 1958.

The matter was submitted to the Board of Tax Appeals upon the notice of appeal, the statutory transcript supplied by the Tax Commissioner, the testimony and evidence presented to the Board of Tax Appeals at a hearing in Columbus, Ohio, on March 2, 1960, and the briefs filed by counsel.

Counsel for the parties agree that, for the purpose of deciding the issue involved in this case, there is no distinction between sales tax and use tax. We will therefore make no such distinction in this entry. Counsel for appellant has also stipulated that appellant is not contesting $1,368.46 of the basic assessment of $3,339.92 set out in the final order of the Tax Commissioner, and that the basic assessment still in issue before the Board of Tax Appeals is as follows:

Basic Sales Tax _____$ 586.13
Basic Use Tax _____1,385.33

(Total Basic Tax still in issue) _____$1,971.46

The appellant has submitted to the Board of Tax Appeals a written detailed breakdown of the items still in issue and this breakdown is herewith made a part of the record in this case.

The notice of appeal filed herein by appellant contains the following language:

"Said final sales and use tax assessments are made upon purchases by appellant of the following items of tangible personal property for the conduct of appellant's business of operating a foundry engaged in the manufacture of iron castings for sale.

"1. Machines used in making sand moulds for the manufacture of castings.

"2. Machines for the making of sand cores to be used in sand moulds for the manufacture of castings.

"3. Machines that process the sand used in the making of sand moulds in the manufacture of castings.

"4. Maintenance and repair parts for the foregoing machines.

"5. Materials purchased for temporarily holding sand cores in racks between the time of their manufacture and their incorporation into sand moulds.

"Said sales and use tax assessments are erroneous and unlawful and contrary to law for the reason that the items of tangible personal property hereinabove set forth were purchased by appellant for the purpose of being used and were used by appellant directly in the production of tangible personal property; to-wit, iron castings, for sale by manufacturing. The purchase of such tangible property was accordingly expressly excluded from the definition of 'retail sale' under the provisions of §5739.01 R. C., upon which sales and use taxes may be levied."

The appellant, the Ohio Stove Company, an Ohio corporation located in Portsmouth, Ohio, is in the business of manufacturing machinable gray iron castings for sale. During the audit period herein involved it purchased certain items of machinery and equipment without the payment of sales or use tax thereon upon the theory that such items were to be used and consumed by it directly in manufacturing machinable gray iron castings for sale. The Tax Commissioner, being of the view that said items were not used by the appellant directly in manufacturing gray iron castings for sale, proceeded to confirm the sales and use tax assessment now in issue.

The specific items of tangible personal property involved in this proceeding consist of (1) sand molding machinery and equipment, (2) core making machinery and equipment, (3) sand conditioning equipment and (4) maintenance repair parts required for such machinery and equipment. It is to be noted that the assessment does not involve sand, molding clay or additives which are the ingredients used to make the sand molds and sand cores which shape molten metal into the form ordered by appellant's customers.

A sand mold is, in essence, a rectangular cube of compressed molding sand (formed in two separate parts) which contains within it a hollow impression, which impression corresponds to the shape of the desired casting. When molten metal is poured into a sand mold, the impression is filled with metal which, as it cools, solidifies into a rough casting. The sand molds are produced by the use of the molding machines and equipment which are in issue. The function of the molding machine is to compress molding sand around one half of a pattern which is mounted on the molding machine. The pattern creates an impression or cavity in the molding sand when the sand is pressed about it by the molding machine and this impression or cavity corresponds to one half the shape and contour of the desired casting. After the sand mold is formed by the molding machine, the sand mold is removed therefrom and placed on a pallet where it forms one half of a completed sand mold. When the sand mold containing the other half of the pattern impression is joined with the first one, the completed sand mold is ready for the molten metal to be poured into the cavity. The sand molds,

produced by these molding machines, are fragile and cannot be crated or shipped and appellant cannot buy them on the open market. The molds deteriorate and dry out rather rapidly and must be used within twelve hours after production. The sand mold can be used only once for shaping a casting and after a casting is poured and the metal solidifies, the casting is separated from the sand mold and the sand mold, as such, is destroyed. The sand that remains after the casting is removed from the sand mold must be retreated before it is again useable in making another sand mold.

The Tax Commissioner says (1) that this molding machine equipment is used directly in making sand molds, (2) that said sand molds are not produced or manufactured for sale and (3) that the sand molds are the things that are used directly in producing machinable gray iron castings for sale and that the raw materials used in sand molds have not been subjected to taxation.

The appellant says that this molding machine equipment is indispensable in the manufacture of gray iron castings because sand molds cannot be purchased on the open market but must be produced by the appellant so that appellant can use them to form the castings which it sells.

The appellee cites the case of **General Motors Corp., Fisher Body Division v. Bowers** (B. T. A. Case Number 37200 decided December 2, 1958), **169 Oh St 361**, as authority for the proposition that the sand molding machines and equipment which appellant **purchased** cannot be said to be used **directly** in the production of tangible personal property (iron castings) for sale by **manufacturing**.

In the General Motors case that company purchased certain machines which were used in the manufacture of dies and the manufactured dies were, in turn, used to stamp out parts of automobile bodies. In that case the court held there was no direct use under the statute and so the purchases of the die making machinery were taxable. At page 364 of the General Motors opinion, we read:

"Restated and reduced to its lowest terms, the question before this court is whether the statutory sales and use tax exceptions are applicable to tools purchased and used for the manufacture of other tools which in turn are later used directly in the manufacture of automobile body panels to be sold by the appellant. The appellant asks this court to hold that since the **manufactured** tools are used directly in the manufacture of body panels the **purchased** tools likewise are used **directly** in the later manufacture of the body panels although the use of the purchased tools is limited to the earlier production of the manufactured tools. To so hold would constitute a disregard of the plain meaning of the word 'directly' which the dictionaries define as 'without the intervention of a medium or agent.' It would seem beyond cavil that the manufactured tools are an intervention between the purchased tools and the final body panels."

We believe that the reasoning of the Supreme Court in the General Motors case would require that this Board hold that the appellant's molding machines are not excepted or exempted from sales and use

tax as being used **directly** in manufacturing gray iron castings for sale.

In the General Motors case the machines used to manufacture the dies were not used to stamp out automobile body parts.

In the case now before us the machines used to manufacture or produce the sand molds are not used to form the castings.

If, as the Supreme Court said in the General Motors case "It would seem beyond cavil that the manufactured tools (**dies**) are an intervention between the purchased tools (**die making machinery**) and the final body panels," (emphasized words added) it would only seem logical to say that it is also beyond cavil that the manufactured sand molds are an intervention between the purchased molding machines and the machinable gray iron castings.

The appellant, however, says that its case can be distinguished from the General Motors case in at least two respects, to wit:

(1) Dies for stamping out automobile body panels could have been purchased by General Motors whereas no one manufacturers sand molds for sale.

(2) The dies in the General Motors case were used more than once for stamping out automobile body panels whereas a sand mold can be used only once to produce a gray iron casting.

We fail to see where the Supreme Court, in the General Motors case, based its decision in any way upon the fact that General Motors could have purchased dies instead of manufacturing them, nor do we think that the court's decision was influenced by the fact that a die could be used more than once to stamp out automobile body panels. We believe that the court's decision was grounded solely upon the proposition that there was an intervention of an agent or medium between the purchased machines and the final body panels.

We therefore find that appellant's molding machinery and equipment is not used **directly** in manufacturing gray iron castings for sale and, therefore, is not excepted nor exempted from sales or use taxation. We find that the sand molds are the items used directly in manufacturing gray iron castings for sale and that said sand molds are mediums or agents which intervene between the sand molding machines and the gray iron castings.

The core making machinery and equipment is used by appellant to manufacture sand cores which are placed in sand molds prior to the pouring of the molten metal in the sand mold. Sand cores are used by appellant in its sand molds when the manufactured casting, as a part of its design, contains an internal cavity. In order to create the desired cavity within a casting, it is necessary for appellant to insert a sand core in the sand mold prior to pouring the molten metal in the sand mold. The core corresponds in size and shape to the desired cavity and functions as a barrier within the mold which prevents the molten metal from filling the cavity when the mold is poured.

Appellant produces sand cores by use of "core boxes" and core making machines and equipment. The "core box" is, for all practical purposes, the pattern for the core. This box is inserted in the core making machine at which point a special core sand mixture is blown by the machine into the "core box" under pressure. Thereafter, the "core box"

is removed from the machine and the sand cores formed therein are taken out and placed on metal trays  The sand cores are then baked or "cured" by heating them for one or two hours in a core oven.  When the sand cores are removed from the core oven they must be cooled before they can be used and for that purpose they are placed on core cooling racks.  The primary purpose and use of such cooling racks is to cool the freshly baked cores and the storage thereon of cooled cores is merely an incidental use.  When needed the cooled sand cores are removed from the racks and taken to the molders who insert them in the mold cavity, after which molten metal is poured into the mold. Appellant's pneumatic core truck is used to carry the sand cores to the molders.

The testimony indicates that when sand cores are removed from the "core box" and core making machine they must be baked in the core oven within two hours and the baked sand cores must be used within two months.

The record discloses that after sand cores are placed in a sand mold, and the molten metal is poured therein, the heat of the molten metal causes the sand core to disintegrate.  A sand core can, therfore, be used only once.  It is also established that appellant cannot purchase sand cores on the market and that it is essential to the manufacture of gray iron castings that appellant also manufacture sand cores.

What has been said heretofore with reference to appellant's sand mold machinery and equipment applies with equal force to appellant's sand core machinery and equipment.  The sand core is an intervening agent or medium between the sand core machine and the gray iron casting manufactured for sale.  The purchase of said machinery and equipment is therefore not excepted or exempted from sales or use taxation.

Appellant's sand conditioning machinery and equipment is used to transport and to blend the sand, water, binders and additives so that appellant can produce molding sand for use in its sand molding and core making machines.  In blending core sand it is necessary to use new sand as the principal ingredient.  In blending molding sand it is established that reconstituted sand can be used.  After a sand mold has been poured and the metal has solidified the sand mold is "dumped" by pulling the bottom board out from under the mold.  The "dumping" of the sand molds results in the complete destruction of the molds and the sand cores contained therein and further results in a heap of sand and castings.  At this point the sand has been dried out as a result of the pouring of the mold and cannot, without further conditioning, be used by appellant to make new molds.  After the molds have been "dumped," the pile of castings, excess metal and sand are scooped up by appellant's front end tractor loader, which vehicle transports the castings, broken molds and excess metal to appellant's "shakeout machine" a portion of which machine is shown in the upper right hand corner of appellant's Exhibit D.  The "shakeout machine" by a vibrating and screening action, separates the castings from the sand.  The sand filters out of the "shakeout machine" onto a magnetic conveyor belt which

belt, while retaining thereon pieces of "tramp" metal, lifts the sand, by means of vertical bucket elevators, into a hopper bin. From the hopper the sand is fed to appellant's sand muller at which point water and binders are added and the ingredients mixed. This mixture is then run through a sand royer (Appellant's Exhibit F:) and then is distributed to appellant's various molding stations where it is used to make sand molds on appellant's molding machines. Appellant uses its front end tractor loaders (Appellant's Exhibit D.) to redistribute the reprocessed molding sand to the molding stations.

The ingredients of core sand are new sand, water, oils and binders, such as flour, which ingredients are mixed in a core sand muller and then delivered to the core making machine where the mixture must be used within four to six hours or not at all.

The evidence establishes the fact that neither molding sand mixture nor core sand mixture can be purchased on the open market by appellant.

It is clear to the Board of Tax Appeals that the sand conditioning machinery and equipment used by appellant in the preparation of molding sand and core sand is not used directly in the production of gray iron castings for sale. The sand conditioning machinery and equipment produces molding sand mixture and core sand mixture, which mixtures are not sold but are used by appellant in making sand molds and sand cores which items are likewise not sold but are used by appellant to form and shape gray iron castings which are sold. It appears to the Board of Tax Appeals that this sand conditioning machinery and equipment is even further removed from a direct use in manufacturing gray iron castings than are the molding and core making machines.

The maintenance and repair parts for the machinery and equipment herein found to be taxable are likewise, and for the same reason, found to be taxable.

There is considerable evidence in the record in this case tending to show that the acquisition and use of the various items of machinery and equipment here in question were essential to the operation of this gray iron casting foundry. Effect could be given to this evidence only upon the "integrated plant" theory as the basis for the application of the provisions of §§5739.01 and 5741.01 R. C. However, in this connection we note the decision of the Supreme Court in the case of **The Youngstown Building Material & Fuel Co., v. Bowers, Tax Commr., 167 Oh St 363,** wherein the court held:

"In determining whether tangible personal property is used or consumed directly in the production of tangible personal property for sale by manufacturing or processing, and, therefore, whether its sale or use is excepted from taxation under the provisions of subdivision (E) (2) of §5739.01 R. C., or subdivision (C) (2) of §5741.01 R. C., the test is not whether such property is essential to the operation of an 'integrated plant,' the test to be applied being, when does the actual manufacturing or processing activity begin and end, and is the property used or consumed **during and in the manufacturing or processing period.**"

Upon the considerations above noted it is by the Board of Tax

Appeals considered and ordered that the final order of the Tax Commissioner herein complained of be, and the same hereby is, affirmed.

I hereby certify the foregoing to be a true and correct copy of the action of the Board of Tax Appeals of the Department of Taxation this day taken with respect to the above matter.

Ronald R. Calhoun

SECRETARY